UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.

DURIELL DEANGELO PANKEY,

    Defendant.

Case No. 3:11-cr-00451-HA

OPINION AND ORDER

HAGGERTY, District Judge:

    Defendant Duriell Dangelo Pankey is charged with one count of Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Defendant filed a Motion to Suppress Evidence and Statements [27]. This court held an evidentiary hearing on November 14, 2012. The two arresting police officers involved in the incident at issue and the defendant provided testimony. For the following reasons, defendant's Motion to Suppress Evidence and Statements is DENIED.

PAGE 1 - OPINION AND ORDER

## BACKGROUND

Because warrantless searches and seizures are *per se* unreasonable, the government bears the burden of proof in demonstrating that a warrantless search or seizure comes within an exception to the Fourth Amendment's warrant requirement. *United States v. Struckman*, 603 F.3d 731, 743 (9th Cir. 2010). Accordingly, the "government bears the burden of showing specific and articulable facts to justify" a warrantless search. *Id.* (quoting *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002)). Where the legality of a government search depends on the existence of a particular fact or circumstance, the government must prove that fact.

On June 26, 2011, at approximately 10:00 in the evening, Officers Brian Dale and Charles Greulich were on patrol as members of the Portland Police Bureau's gang enforcement team in Portland, Oregon. As they drove eastbound on North Killingsworth Court they saw defendant walking northbound on North Bothwick Avenue. Officer Dale had previously had a number of non-confrontational "contacts" with defendant and believed him to be a member of the Rollin' 60s Crips. Defendant was wearing a puffy windbreaker type jacket and the officers thought this was unusual given the fact that it was late June. The officers circled around the block and spotted defendant walking westbound on North Killingsworth Street, in the same direction they were traveling. Officer Dale pulled the unmarked Ford Crown Victoria across the two-way street and parked it on the south side of North Killingsworth Street near defendant.[1] While the unmarked car did not bear outward police insignia, Officer Dale testified that it is easily recognized as a police car in that neighborhood.

---

[1] Officer Dale testified that he parked behind defendant, Officer Greulich testified that they parked even with defendant, and defendant testified that they parked just in front of him.

PAGE 2 - OPINION AND ORDER

Upon stopping the car, the two officers stepped out of the vehicle and Officer Dale called defendant by his last name.[2] Upon hearing Officer Dale, defendant stopped and turned to face the officers. Both officers were in uniform and were carrying department issue sidearms as well as other less-lethal weapons on their utility belts. Neither officer drew a weapon or made any outward show of authority. Defendant testified that he thought the police might be stopping him for an outstanding warrant, however, it does not appear there was a warrant for his arrest at that time. By all accounts, the initial contact by the officers was more-or-less cordial. Defendant acknowledged that the interaction was non-confrontational, and that he could have continued walking. Officer Dale asked defendant how his evening was proceeding and defendant responded to the effect that he was doing fine. It was only after the first few seconds of contact that defendant's testimony diverges from that of the officers in any meaningfully substantial respect.

After the initial pleasantries, Officer Dale testified that he asked defendant if he was carrying a weapon. Officer Dale testified that defendant responded that he was carrying a ".45" in his pocket. Officer Greulich testified similarly, but stated that defendant responded he was carrying a "gun." Both officers estimated that around ten seconds had lapsed between the time they first approached defendant and the time that he admitted he was carrying a firearm. During the conversation, Officer Dale was standing approximately three feet from defendant. Officer Dale testified that, after defendant admitted he had a gun, he grabbed defendant's right arm and turned him away from the officers. Officer Greulich then assisted Officer Dale in completing the

---

[2] Officer Dale testified that he thought he had said something like "what's up" but may have called him by his last name. Officer Greulich did not recall what Officer Dale said. Defendant clearly recalled being haled by his last name.

PAGE 3 - OPINION AND ORDER

arrest. Officer Greulich testified somewhat differently. He testified that, after defendant admitted he had a gun, Officer Dale instructed him to place his hands on his head. Officer Greulich then moved in to make the arrest while Officer Dale retrieved the gun. Officer Dale testified that he read defendant his *Miranda* rights approximately six minutes later.[3]

Contrary to the officers, defendant testified that after exchanging pleasantries with Officer Dale, he was ready to terminate the encounter and turned to leave. As he turned to leave, Officer Dale grabbed his right arm and their two arms brushed his hip area, where he had a cell phone in his jacket pocket and a handgun in his pants pocket. At that point, Officer Dale instructed defendant to put his hands on his head while he initiated a search of defendant. Only then did defendant admit he was carrying a handgun. According to defendant's testimony, Officer Dale issued his *Miranda* warnings as defendant was arrested.

Ultimately, the question presented to the court is whether Officer Dale grabbed or searched defendant before or after defendant admitted he had a gun. Whether the officers' version of events or defendant's version of events is more likely hinges not only on the credibility or honesty of the witnesses, but on the totality of the circumstances and the evidence, including the passage of time. The events in question took place in a matter of seconds over one year ago. Because each witness differs from the others in at least some respect, at least two of the witnesses were mistaken or dishonest regarding some portion of their testimony. The court suspects that each witness was mistaken in at least some particular. If the officers are to be believed, defendant's admission regarding the handgun was nearly spontaneous. However, if defendant is to be believed, Officer Dale escalated what was a relatively low-key encounter into a

---

[3] The timing of the *Miranda* warnings has not been put at issue by the instant motion.

physical search with nearly the same spontaneity. Whether defendant was seized before or after admitting he had the gun is a close question, and one on which the government has the burden of proof. However, after hearing the testimony and considering the evidence, the court concludes that the events took place as described by the officers: there was no physical contact or overt show of force until the defendant admitted he was carrying a hangun.[4] Of particular, though not exclusive, import to the court's finding is the fact that both officers testified consistently and clearly regarding defendant's admission. They both testified that defendant had not been touched when he admitted he had a gun. Officer Greulich readily acknowledged that he was unclear on several aspects of the evening, but testified that the immediacy of defendant's admission caught him off guard. Additionally, the fact that defendant mistakenly believed he was being picked up on a warrant may have led him to admit possession of the gun when under different circumstances, he might not have.

Following the arrest, defendant made a number of incriminating statements. The officers transported defendant to the Portland Police Bureau's North Precinct and defendant made further statements and signed a written confession.

## **DISCUSSION**

Defendant asks this court to suppress all evidence obtained by the government on June 26, 2011. Defendant contends that the police stopped him without reasonable suspicion and then seized and searched him without probable cause. Defendant contends that the discovery of the handgun, as well as defendant's incriminating statement made as a result of the illegal search and

---

[4] In so finding, the court does not believe that any of the witnesses, including defendant, testified dishonestly.

seizure must be suppressed.

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures of people or property and provides that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons to be seized.

U.S. Const. amend. IV. The Fourth Amendment's protections are applied to the states, and state actors, through the Fourteenth Amendment. *Elkins v. United States*, 364 U.S. 206, 212-13 (1960).

### 1. Initial Police Contact with Defendant

The Fourth Amendment's protections extend to brief investigatory stops or seizures that fall short of a traditional arrest. *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1020 (9th Cir. 2009) (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). A police officer does not need probable cause to effectuate an investigatory stop, but such stops must be "supported by reasonable suspicion to believe that criminal activity may be afoot." *Arvizu*, 534 U.S. at 273 (quotation omitted). Reasonable suspicion is evaluated under the totality of the circumstances and "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion." *United States v. Valdes-Vega*, 685 F.3d 1138, 1143 (9th Cir. 2012).

A person is "seized" within the meaning of the Fourth Amendment when "by means of physical force or show of authority, his freedom of movement is restrained." *United States v. Smith*, 633 F.3d 889, 892 (9th Cir. 2011) (quoting *United States v. Mendenhall*, 446 U.S. 544,

553 (1980)). "In the absence of physical force, in order to constitute a seizure, an officer's show of authority must be accompanied by submission to the assertion of authority." *Id.* (citation omitted).

In this case, Officer Dale recognized defendant, believed him to be a member of the Rollin' 60s Crips and thought it was suspicious that he was wearing a puffy jacket in late June. The mere wearing of a puffy jacket, even by an alleged gang member, does not provide a police officer with reasonable suspicion to believe that an individual has committed a crime or is in possession of contraband. A puffy jacket is not an uncommon article of clothing and can be worn for many lawful reasons having little to do with the weather. Additionally, defense Exhibit 101 establishes that the weather on June 26, 2011, was unseasonably cool and would not make the use of a puffy jacket unreasonable.[5] Nonetheless, the court cannot conclude that defendant's Fourth Amendment rights were violated as the officers' initial contact with defendant did not constitute a stop, as far as the Constitution is concerned.

When the two officers initially contacted defendant, they did not order him to stop; they did not display their guns or utilize the siren and lights on their police cruiser; they did not obstruct his path, or in any other way overtly display force such that a reasonable person would think they were not free to go. The only facts that militate toward a finding that the initial encounter was nonconsensual are the fact that Officer Dale called defendant by name, and that the officers pulled their cruiser across traffic and parked in the wrong direction to reach defendant. However, the testimony of all three witnesses established that the conversation with

---

[5] The court also notes that defendant wore a puffy jacket to a status conference on September 25, 2012, despite the fact that the weather did not necessarily call for such attire. The court is quite sure defendant was not carrying a weapon during the status conference.

PAGE 7 - OPINION AND ORDER

defendant was low-key. In fact, defendant testified that he had chosen to terminate the encounter when Officer Dale made physical contact with him. The case law is "clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). A person is not seized for purposes of the Fourth Amendment if "a reasonable person would feel free 'to disregard the police and go about his business.'" *Id.* (quoting *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). So long as an encounter is consensual, reasonable suspicion is not required. *Id.* Under the above facts, the court finds that the initial encounter, prior to defendant's admission regarding the .45, was consensual in nature.

### 2. Search and Seizure of Defendant

Officers Dale and Greulich seized defendant for Constitutional purposes when they grabbed and searched him after he admitted he had a gun in his pocket. Police officers may execute a warrantless arrest where the "officers have probable cause to believe that an offense has been, is being, or will be committed." *United States. v. Saginetto-Miranda*, 859 F.2d 1501, 1508 (9th Cir. 1988) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "Probable cause to arrest exist when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007). "The substance of all definitions of probable cause is a reasonable ground for belief in guilt and that belief of guilt must be particularized with respect to the person to be searched or seized." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (citations and quotations omitted).

The moment that defendant admitted he had a gun in his pocket, Officers Dale and

PAGE 8 - OPINION AND ORDER

Greulich had probable cause to execute a warrantless search and arrest.[6] Because the search fell within the confines of the Fourth Amendment, defendant's motion to suppress the gun must be denied. Additionally, as defendant's request to suppress the statements is premised on an unlawful search and arrest, that request must also be denied.

## CONCLUSION

For the reasons provided, defendant's Motion to Suppress Evidence [27] is DENIED. The parties shall confer regarding trial dates and a briefing schedule for any additional pretrial motions. After conferring, the government shall advise the court whether it is withdrawing or pursuing its Motion in Limine [34] to exclude evidence of a mental condition and shall notify the court regarding future dates agreeable to both parties.

IT IS SO ORDERED.

Dated this 29 day of November, 2012.

ANCER L. HAGGERTY
United States District Judge

---

[6] Officer Dale believed, but did not know, that defendant was a convicted felon. Additionally, the possession of a concealed weapon in Oregon is generally unlawful. Or. Rev. Stat. 166.250.